IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CR-24-428-D |
| ) | |
| JIMMY ROGERS GATEWOOD, JR., ) | |
| ) | |
| Defendant. ) | |

## ORDER

Defendant, Jimmy Rogers Gatewood Jr., was indicted on one count of Felon in Possession of Firearms in violation of 18 U.S.C. 922(g)(1). Before the Court is his Motion to Suppress Involuntary Confession [Doc. No. 64]. On June 25, 2025, the Court held a hearing on Defendant's motion. For the reasons set forth below, the motion is denied.

### Background[1]

At 6:00 AM on the morning of May 14, 2024, Federal Bureau of Investigation ("FBI") agents served a search warrant at the home of Jimmy Rogers Gatewood Jr.'s co-defendant Dewayne Jones-Lusk. Mr. Jones-Lusk's mother, Kendra Lusk, lived in the home and was present at the time. Defendant, Mr. Gatewood, Ms. Lusks's boyfriend and the father of one of Ms. Lusk's children, was also present.

At the suppression hearing, Oklahoma City Police Department Officer and FBI task force officer Charles Pundsack testified. According to Officer Pundsack, the purpose of the

---

[1] The following fact pattern is derived from uncontested testimony provided during the suppression hearing.

1

search was to locate and recover a machine gun conversion device that the FBI believed Mr. Jones-Lusk possessed. Mr. Gatewood was not suspected of illegal activity prior to the search.

The search lasted between one and 1.5 hours, during which time Mr. Gatewood was placed in a police vehicle and separated from Ms. Lusk. Although not looking for additional firearms, officers found two rifles in a bedroom that they believed was shared by Ms. Lusk and Mr. Gatewood.[2]

A separate, unnamed officer then ran criminal history reports on Ms. Lusk and Mr. Gatewood. That officer informed Officer Pundsack that both individuals had prior felony convictions. Officer Pundsack then interviewed Ms. Lusk, who denied that the firearms were hers.

Officer Pundsack and FBI Special Agent Joseph Keyes proceeded to interview Mr. Gatewood.[3] According to both officers' testimony, the interview lasted between 15 and 20 minutes. According to Officer Pundsack, the tone of the interview was cordial, took place outside of the police vehicle, and Mr. Gatewood was not handcuffed.

Officer Pundsack advised Mr. Gatewood of his *Miranda* rights. Mr. Gatewood waived his rights and asked what the officers had found in the search. Mr. Gatewood then

---

[2] The extent to which Mr. Gatewood lived in the home was contested. The evidence, however, established that at the very least Mr. Gatewood was a frequent visitor and at times occupied the bedroom with Ms. Lusk.
[3] Agent Keyes testified that he wore a body camera during the search of the home but turned off the recording during the interview pursuant to a nationwide FBI policy.

denied any knowledge of firearms in the bedroom. He also represented that he "really d[idn't] stay" at Ms. Lusk's residence because he had a place of his own.

About half-way through the interview, Officer Pundsack told Mr. Gatewood that, since neither Mr. Gatewood nor Ms. Lusk could lawfully possess firearms, "someone would have to answer for [the] firearms" found in the bedroom. Officer Pundsack also communicated that if everyone were arrested, Ms. Lusk's minor children, including Mr. Gatewood's child with her, would "go into DHS custody"[4] because "no one in th[e] house [could] possess guns."

When specifically asked by the Court how many times he brought up possible DHS involvement, Officer Pundsack responded that he did so briefly, mentioning it, at most twice, but more likely once. The Court also asked if a procedure existed for preventing DHS involvement in the event of a parent's arrest. Officer Pundsack responded affirmatively, stating that officers usually inquire into whether other family members are available to care for the children, which information would be passed on to DHS. He further stated that, in this instance, neither he nor Agent Keyes made such an inquiry.

Agent Keyes testified as well. He described the interview with Mr. Gatewood as "cordial" and "polite." All parties maintained "calm" temperaments. He further stated that he personally maintained a "sympathetic mindset" toward Mr. Gatewood because they were "not there for him."

---

[4] Department of Human Services ("DHS").

Near the end of the encounter, Mr. Gatewood confessed that the firearms were his. He was then able to describe the two rifles uncovered in the bedroom, noting the unique coloring of one.

## Standard of Decision

"The Fifth Amendment prohibits the government from using an involuntary confession as evidence in a criminal trial." *United States v. Pena*, 115 F.4th 1254, 1257 (10th Cir. 2024). Understanding whether a defendant's confession was voluntary is a "fact-intensive inquiry[.]" *United States v. Lamy*, 521 F.3d 1257, 1263 (10th Cir. 2008). "The existence of a threat is not dispositive—all of the circumstances must be examined." *United States v. Rodebaugh*, 798 F.3d 1281, 1292 (10th Cir. 2015); *see also Fikes v. Alabama,* 352 U.S. 191, 197 (1957) (the voluntary character of a confession must be determined by the totality of the circumstances); *Oregon v. Elstad,* 470 U.S. 298, 318 (1985) (same). The government bears the burden of demonstrating a confession is voluntary by a preponderance of the evidence. *Pena*, 115 F.4th at 1261.

The overarching question is whether "law enforcement overbore the defendant's free will and critically impaired the Defendant's capacity for self-determination." *Id.* at 1260 (internal citation omitted). Factors to be considered "include (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment." *United States v. Lopez,* 437 F.3d 1059, 1063-64 (10th Cir.2006).

**Analysis**

Defendant argues that "threats" by law enforcement that the three minor children would be taken into DHS custody if he and Ms. Lusk were arrested was coercive, overbore his free will, and resulted in an involuntary confession. The government asserts that the statement regarding DHS custody of the children, in context, did not amount to a threat and was not overly coercive.

Of the five *Lopez* factors listed above, each suggests Defendant's confession was voluntary except, arguably, the third. Although no testimony was presented as to Mr. Gatewood's education level or intelligence, nothing suggests that he did not understand the questions being asked or the consequences at stake. Furthermore, Mr. Gatewood was detained for an hour and a half before being questioned for only 20 minutes. He has prior history with law enforcement, was advised of his constitutional rights (which he waived), and he was not threatened with physical punishment.

Concerning the third factor—the nature of the questioning—the Court is persuaded that the officers' mentioning that if both Mr. Gatewood and Ms. Lusk were arrested, Ms. Lusk's children would be placed in DHS custody does not, in this context, dispositively counsel a contrary result. The Court looks to three cases for guidance: *Lynumn v. Illinois*, 372 U.S. 528 (1963), *Pena*, 115 F.4th 1254, and *United States v. Perez*, 127 F.4th 146 (10th Cir. 2025).

In *Lynumn*, the Supreme Court addressed whether threatening to take away someone's child renders a confession involuntary. Analyzing the testimony given at trial, the Supreme Court stated the following:

5

> "It is [ ] abundantly clear that the petitioner's oral confession was made only after the police had told [the defendant] that state financial aid for her infant children would be cut off, *and her children taken from her*, if she did not 'cooperate.' These threats were made while she was encircled in her apartment by three police officers and a twice convicted felon who had purportedly 'set her up.' There was no friend or adviser to whom she might turn. She had had no previous experience with the criminal law, and had no reason not to believe that the police had ample power to carry out their threats." *Lynumn*, 372 U.S. at 920 (emphasis added).

In those circumstances, the Supreme Court stated "[w]e think it clear that [the] confession … must be deemed not voluntary, but coerced." *Id.*

In *Pena*, the Tenth Circuit addressed a confession where law enforcement had (1) overstated the strength of the evidence; (2) initially (and falsely) denied that the defendant was a suspect; (3) questioned the defendant for almost four hours; (4) employed certain aggressive techniques (such as invading the defendant's personal space and raising their voices); and (5) implied that the defendant's children might commit suicide because of the defendant's actions. *Pena*, 115 F.4th at 1263. In affirming the district court's denial of the defendant's motion to suppress his confession, the Circuit Court held that "deceit does not inherently render a confession involuntary[.]" *Id.* (citations omitted). Furthermore, the fact that law enforcement's conduct "deserve[d] execration" did not rise to the level of a Fifth Amendment violation. *Id.* Instead, the constitutional inquiry revolved around whether the confession was an "*essentially* free and unconstrained choice." *Id.* at 1261-62 (emphasis added). Because the defendant was (1) "not particularly susceptible to coercion," (2) repeatedly advised of his *Miranda* rights, (3) questioned for less than four hours, and (4) provided with breaks, law enforcements' "troubling" tactics did not render the defendant's confession involuntary. *Id.* at 1261.

6

In *Perez*, an officer asked the defendant about his "children, their ages, and their relationships with [the defendant]." *Perez*, 127 F.4th at 176. The officer then stated that the defendant "faced ten [years] to life in prison." *Id.* (internal quotation marks omitted). In affirming the district court's denial of the defendant's motion to suppress, the Circuit Court reasoned that the officer's comments "described a likely collateral consequence of incarceration, amounting to no more than a commonsense statement of fact." *Id.* Furthermore, "the record [did] not suggest … that [the defendant] reacted to or weakened from this stated reality." *Id.* Therefore, the officer's "brief reference to [the defendant's] children, *lasting less than a minute*, [did] not contribute much, if anything to suggest a coercive interrogation." *Id.* (emphasis added).

Here, Mr. Gatewood's situation is more analogous to *Perez* than *Pena* or *Lynumn*. The present case differs factually from *Pena*, but like in *Pena*, Mr. Gatewood was not "particularly susceptible to coercion." He was advised of his rights, and the length of the questioning was reasonable. Like in *Perez*, Officer Pundsack's reference to removing the children was brief and a genuine potential consequence that could be construed as a statement of fact. Importantly, nothing suggests that Mr. Gatewood reacted to or was swayed by the statement regarding the children. Lastly, unlike in *Lynumn*, Mr. Gatewood has previous experience with law enforcement and was not in a comparable situation as the defendant in that case.

Based on the totality of the circumstances and the preponderance of the evidence standard, the government has carried its burden and demonstrated that Mr. Gatewood's decision to confess was voluntarily made.

7

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Involuntary Confession [Doc. No. 64] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's trial date, currently scheduled for July 8, 2025, is stricken and reset to the Court's August 12, 2025, trial docket.[5] All pretrial motions, including motions in limine, shall be filed by July 29, 2025. Responses to pretrial motions shall be filed by August 5, 2025. Requested jury instructions and voir dire shall be filed by August 1, 2025. Objections to requested jury instructions and voir dire shall be filed by August 8, 2025.

**IT IS SO ORDERED** this 7th day of July, 2025.

_____
TIMOTHY D. DeGIUSTI
Chief United States District Judge

---

[5] The period comprising the pendency of the motion is excluded for purposes of the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(1)(D).